## CHICAGO, R. I. & G. RY. CO. v. ZUMWALT.
### (No. 1729.)

(Court of Civil Appeals of Texas. Amarillo. Dec. 22, 1920. Rehearing Denied Jan. 19, 1921.)

1. **Railroads** &#8596;307(4)—**Watchman required at crossing peculiarly dangerous.**

There is no legal duty resting upon a railroad company to provide a watchman at a crossing, unless such crossing is so peculiarly dangerous that an ordinarily prudent person could not use it with safety.

2. **Railroads** &#8596;328(3)—**Motortruck driver not required to stop and get out at crossing.**

Driver of a motortruck is not required to stop his truck and get out and walk on to a main track at a crossing, where view is obstructed by standing cars, to see whether or not a train is approaching.

3. **Railroads** &#8596;348(3)—**Finding of negligence in failing to station flagman at obstructed crossing sustained.**

In an action for damages to a truck struck at a crossing, a finding that the railroad was negligent in not having a flagman at the crossing at the time *held* sustained by evidence showing that the wind, together with intervening buildings and cars, prevented the driver from hearing the bell or whistle of the oncoming passenger train which could not be seen by reason of the obstructed view.

4. **Railroads** &#8596;348(9)—**Finding of no contributory negligence on part of truck driver with obstructed view warranted.**

In an action for damages to a truck struck at a crossing where structures and cars obstructed the view and hearing, evidence *held* sufficient to sustain the finding of the jury that plaintiff was not guilty of contributory negligence.

5. **Damages** &#8596;113—**Difference in value measure for injury to truck.**

In an action for injury to a motortruck at a railroad crossing, measure of damages was the difference between the market value of the truck immediately before and immediately after the collision, and not the cost of repairing the truck.

Appeal from District Court, Potter County; Henry S. Bishop, Judge.

Action by J. L. Zumwalt against the Chicago, Rock Island & Gulf Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

C. E. Gustavus, of Amarillo, and N. H. Lassiter, of Ft. Worth, for appellant.

Pearson & Monning, of Amarillo, for appellee.

HALL, J. Appellee, Zumwalt, brought this action against the appellant to recover damages on account of a collision between the defendant's passenger train and a truck which appellee was driving over a public crossing in the town of Vega. Appellee alleged that defendant was negligent: (1) In failing to warn plaintiff of the approach of said train; (2) in failing to have a competent watchman, or any watchman, at the crossing to give warning of the approach of said train; (3) in failing to give plaintiff any notice whatsoever of the approach of said train; (4) in allowing a long freight train to stand so near the crossing on the middle track as to cut off the plaintiff's view to the westward along the north track, thereby preventing plaintiff, although in the exercise of ordinary care for the safety of himself and his truck, from seeing down said north track to the west and from seeing the approaching passenger train until it was within a few feet of the crossing and of plaintiff; and (5) in failing to signal or otherwise notify the plaintiff of the approach of said train or its danger therefrom. A number of special issues were submitted to the jury, inquiring whether defendant's employees sounded the whistle and rang the bell as the train approached the crossing, but the judgment is based upon the affirmative finding of the jury to special issue No. 2, inquiring whether defendant was guilty of negligence in failing to have a watchman at the crossing where the collision occurred at the time of the occurrence, and whether such failure and negligence, if any, were the proximate cause of the damages. The jury further found that under the circumstances appellee was not guilty of contributory negligence and that the extent of the damages to his truck was $1,558.36. Appellee entered a remittitur of $30, and judgment was entered for the amount of the verdict less the amount of the remittitur.

It appears from the record that the line of appellant's railway through the town of Vega runs east and west; that the highway traveled by appellee as he approached the town of Vega from the east runs nearly parallel with the railroad track, until it enters the limits of the town, when it turns directly north about two blocks from the crossing of the track where the accident occurred; that there are three separate tracks at this crossing, running east and west; that the south track, or the first track crossed by appellee, is known as the "team track;" about 30 feet north of the "team track" is the "passing track," and about 14 feet north of the "passing track" is the main line, upon which the accident occurred; that the highway is known as the Ozark Train and is the main thoroughfare through the town of Vega, and is the

one generally traveled by the public; that after the highway turns north and about 150 to 180 feet south of the crossing, in the town is the Vega Garage, on the west of the highway; north of this and immediately south of the track and west of the highway is the scale or schoolhouse, and west of this, along the railroad right of way, is a large elevator, two oil tanks, the Magnolia filling station, and a warehouse; that the highway, which is also the principal street of the town, is 60 to 80 feet wide. At the time of the accident, there was standing on the middle or passing track, about 14 feet west of the crossing, a freight train, of approximately 30 cars; the caboose being next to the crossing. There were also some box cars on the first or "team track" west of the crossing. There was no watchman, flagman, or other person at the crossing to warn appellee of the approaching passenger train. The crew of the freight train were all at the Vega Hotel at dinner. The passenger train, which struck plaintiff's truck, was due at Vega at 1 p. m. and was running about 10 minutes behind schedule time. On that day a severe wind was blowing and the air was full of dust and sand. The building, structures, freight train, and box cars south on the main track and west of the highway almost entirely obstructed plaintiff's view to the west, from which direction the passenger train came. The noise of the wind tended to prevent travelers from hearing the bell and whistle of the approaching passenger train. Appellee testified in substance as follows:

"Along there on the west side of the street, going north, Harrel Bros. have a garage. I started to stop there and slowed up, but decided to go on over the crossing to the hotel for dinner. That garage is about 50 yards from the railroad crossing. When I changed my mind about slowing up and stopping there, I went on up to the railroad track and there met this train. I approached the railroad track, going very slow—going something like 4 miles an hour. At the crossing there are three tracks. The first track is what they call a 'team track.' It goes by way of the elevator and is used to load or unload material. Then you come to the 'passing track.' This is something like 30 feet north of the team track; then the main line is something like 14 feet north of the passing track. The tracks run east and west and the public road or street goes north and south at that point. I continued to go slow because I always make it a rule to go slow by crossings. The caboose is the part of the freight train that was standing next to the crossing. There was an engine on the other (west) end of that train. It was a long train. I could not see the other end of it from the south until I got up after I crossed the team track. After I crossed the team track I could see the other end then. It was on the middle track. I could not see the other end of that freight train because there was an elevator and some cars standing along there, and you could not see up that way until after you passed the team track. I proceeded to-wards the middle track and was going something like 4 miles an hour—going very slow. As I proceeded I came out from behind the freight train, and, just as I came out from behind it, I saw the passenger train coming, and my front wheels were practically on the rail, and I didn't have time to do anything. I knew I could not get across, and I knew if I stopped, and the train hit me square, why it would turn it over on me, and I threw the clutch out and turned it right just as far down the track as I could; turned it to the east, the way the train was going. I looked up and down the track for signals or for trains as I approached the crossing. Besides looking, I was driving on toward the crossing, and I was listening; I couldn't hear anything. I never heard any bells; I didn't see no smoke; I didn't hear no whistles; I couldn't see a thing in the world until after I drove out from around the freight train. Coming as close as it was, I didn't have a chance in the world to get away; I was practically on the north track, on which this passenger train approached, when I saw this passenger train. I just had come over the line.

"The engine of my truck sticks out quite a ways in front of the seat; something like six foot from the seat where I was sitting up to the front of the engine. There was not a flagman, or watchman, or any one there at the crossing. All the warning I had was when I seen this train. When I seen the train coming, I threw my clutch out, put the brakes on, and turned to the right, going to the east. My brakes were in good condition. My truck was in first class condition, absolutely good shape. My brakes did take. I used all the strength or force I had to apply them, and I am a strong, healthy man. After I turned my truck to the right towards the east, in an effort to avoid this collision, why the next thing was this engine struck me; struck the truck just about where the seat is. There is a garage and elevator on the south side of the track. The railroad crossing is about 14 feet wide; that is the main crossing out there. The crossing itself is not more than 14 feet wide. Of course, you could cross the railroad track there up and down quite a ways the width of the street, but it would be rough. I judge the road there is about 60 feet wide. I was driving about middleways of the crossing, which was the best part of it. That day was a bad stormy day, with a sandstorm blowing and dust was blowing pretty bad. That was the same day the Olympic Building wall fell here in Amarillo. My truck had a cab or top, and I had the curtains up on it on either side. The curtains were not solid, but had isinglass in them of oblong shape, being about 14 inches long and 6 or 7 inches wide. The wind shield was all glass, as in the ordinary car. My truck had a cut-out on it and I had it open that day. I always run with it open on the road. It doesn't make as much noise as you think. It makes a noise all right if you are running it at a very high rate of speed. It makes quite a good deal of racket; but, if you are running it at a low rate of speed, you can hardly tell it is running. The blowing dust didn't keep me from seeing the road, but there was sometime of the day I could not see very far. These isinglass openings were pretty good size. I

could see through them good. One on each side and one in the back and the wind shield in front of me. The isinglass is in the curtain endwise, going from the front towards the wind shield, and back towards the side. The hind end of the truck would be on the main line when the front end is on the passing track.

"The truck is about 18 feet long. The caboose of this freight train was very close—I judge something like 13 or 14 feet from my truck to the end of the caboose; maybe not that far. The caboose was right up against the crossing. Immediately when I got where I could see past the caboose I looked to the westward. When I came from behind this freight train where I could see, my front wheels were practically on the other rail. I was going only about 4 miles an hour; had slowed down about 50 yards from where I was struck. I know where there is a little scalehouse that is near the right of way just west of where I started on this crossing. I judge the passenger train was about 20 feet of me when I first seen it. After I passed the garage out there, I looked west. There at the garage I could see the elevator, the Magnolia filling station, and a number of cars up on past there for possibly half a mile. If the passenger train had been back 3 or 4 miles, or 2 miles, I possibly could have seen it, but it was already behind those cars when I came through there. It was bound to have been, because I was looking west when I came through there and I could not see it. I don't know the time that train was due there at Vega, and I didn't know whether it was about train time or not. As to whether or not I had in my mind anything about a train arriving then, I was watching out for trains because you can't tell when a train will be coming and you don't know when. I always tried to be cautious as possible on a railroad track. I didn't stop when I saw the freight train standing there because, as far as I could see, the track was clear. Four miles an hour is a very slow speed for a vehicle in high gear. It doesn't take much distance to stop a truck going 4 miles an hour; you can stop pretty quick, but I would not say within a foot or two. If I had stopped the truck the chances are I would have been in worse shape than I was. I checked the truck some. Maybe it would have been better if I hadn't tried to stop at all, but I did make an effort to stop and turn up the track. I knew it was a dangerous crossing, for I have never seen a railroad crossing that was safe. I saw the box cars on the team track. There is also an elevator near the team track. The freight train standing on the second track was a long train, containing possibly something like 30 cars; maybe more."

W. L. Hill, another truck driver, testified for appellee in part as follows:

"It was a bad dusty day, and the wind was blowing a hard gale. I guess I was 60 or 70 feet behind him (appellee), and I don't know how much he slowed down, but I gained on him a little. I imagine he slowed down there to 3 or 4 miles an hour when he was in front of the garage, and I imagine he didn't pick up any more speed between there and the railroad crossing; I don't think he did. Besides the garage on the left-hand side of the road, there is a scalehouse and elevator, back possibly 40 to 60 feet, from the first track of the railroad. I think the back end of the freight train is the part of it that was near the crossing, and the caboose was still attached to the train and it looked like a train standing there waiting for another one. I was following right behind the other truck, and we were both going along slow, and I figured that he would go on across the crossing. It seemed to me like he slowed up from the time he hit the little raise there until the train hit him. The fact of the business is, I thought he was going to stop; I didn't know what his idea was. I guess I was from 30 to 50 feet behind him then. I thought he was going to stop there on the first or south track. I didn't know what time that noon Rock Island train was due through there. As I was proceeding along there, I didn't know of a passenger train approaching the railroad crossing, until I seen it hit his truck. That is the first time I saw this train coming out from behind the other train, which was standing there on the track. Up until the time I saw the train hit his truck I had not heard any whistle or bell. I saw no watchman or flagman there at the crossing; didn't see or hear any alarm whatever given of the approach of this train; didn't see any of the train crew of that freight train about the caboose. About the time of the accident to indicate that the plaintiff put on his brakes, his truck slowed quick and he pulled up to the right side or to the east side as far as he could it seemed to me, like, and the passenger train it seemed to me hit him about his front hub. As I approached the crossing, I looked in both directions. Of course, after the elevator and schoolhouse cut off the trackway, I could not see very far up the track west. You could not see very far up that way for the train, the elevator, and schoolhouse. I looked up that way and didn't see any train coming. There is an oilhouse up there. There was not any view up the track. I was pulling in behind him just about the same speed he was going, and I didn't see no reason for him to stop; I didn't see any train or nothing that way to hold him up."

John Copp, defendant's engineer, testified in part:

"The day the accident occurred was stormy, windy, and dusty. In operating the engine that day I used more precaution on account of being a bad day. The wind was blowing, and I took extra precaution at all of the crossings for that matter. The first I seen of this truck was when it was going onto the track right immediately in front of the engine. When I first saw it, I was not over five—well, I was right up against it for that matter; I couldn't hardly state. The truck was coming on to the crossing and he was going on to the street crossing. I didn't see anything of this truck before I was right on it with the engine. The only hindrance to a person hearing the bell or whistle on that day would be the roaring of the wind in your ears. Under such conditions I believe that would interfere with your hearing it. I didn't see any of the freight train crew around the caboose or at the crossing, as I was coming by."

[1] Appellant's first, second, and third assignments attack the verdict and judgment

as being unsupported by the evidence. It was shown that the town of Vega was a village of approximately 300 or 400 people, and appellant contends that, because of the size of the town and the limited number of people who use the crossing in question, the rule announced in Panhandle & S. F. Railway Co. v. Tisdale, 199 S. W. 347, and similar cases, applies. As contended, the general rule is that there is no legal duty resting upon a railway company to provide a watchman at a crossing unless such crossing is so peculiarly dangerous that an ordinarily prudent person could not use it with safety. Appellee does not contend that the duty rested upon appellant to keep a regular watchman at said crossing at all times, but his contention is that appellant was negligent in failing to have a watchman at this crossing at the time and place of the accident, under the existing circumstances. The facts in this case are very similar to the facts in the case of Baker, Receiver, v. Streater, 221 S. W. 1039, in which the rule is stated as follows:

"It might be conceded that there was not sufficient evidence to raise the question of the duty of appellant to maintain a regular or permanent flagman at this crossing, but we think there was evidence enough to present the issue as to the negligence in failing to place a flagman or other employee at the crossing at the particular time, under the circumstances of this case. This duty may exist independently of statute, and it is ordinarily a question for the jury, dependent upon the circumstances of the particular case, as to whether or not ordinary care would require a railroad company to station a flagman or other employee at the crossing. In our opinion, the situation of this crossing at the time made it a question for the jury to say whether the duty existed, and whether the failure constituted negligence."

[2, 3] The facts in the instant case show that a strong wind was blowing from the south and that air was full of dust and dirt. Defendant's passenger train was about ten minutes behind the schedule time. The view of any one approaching the main track, upon which this train came into Vega, was obstructed by a long freight train on one track, several cars on another, and a number of buildings and structures standing near the right of way. It is true that appellee might have avoided the accident by stopping and alighting from his truck and walking on to the main track, where he could have seen in both directions for several miles; but, in our opinion, the law does not require the use of such extraordinary precaution. He did not know when the passenger train was due. He had reduced the speed of his truck to something like three or four miles an hour, and had, as far as he was able, looked west for the purpose of ascertaining whether or not a train was approaching from that direction. The force of the wind probably kept the smoke of the passenger train from rising to where it could be seen by him, and, as explained by the engineer Copp, the roaring of the wind, together with the intervening buildings and freight train, prevented appellee from hearing either the bell or whistle. In accordance with the holding in the Baker Case, we think it is not requiring too much of appellant to say that under such unusual circumstances it should have provided a flagman at that time and place, at least until after its passenger train had arrived and departed. We believe the authorities cited in support of the Baker Case sustain the holding, and we think the evidence brings this case fairly within the rule there announced.

[4] Under the fourth proposition appellant insists that the undisputed evidence shows that the plaintiff, by the use of reasonable care, could have avoided the collision, and that his contributory negligence in driving on the track at the time and in the way he did bars him from the right to recover. The jury found that he was not guilty of contributory negligence, and we think the evidence is sufficient to sustain this finding.

[5] In answer to subdivision (a) of special issue No. 5, the jury found that the difference between the market value of plaintiff's truck at Vega, immediately before and immediately after the collision, was $1,500. This issue submitted the proper measure of damages. The court, however, submitted special issue No. 10, instructing the jury to find what would be the reasonable cost of necessary new parts and of repairing other broken or damaged parts of the truck to restore the same to its former condition, and the answer is $1,000. These findings are made the basis of the fifth assignment of error, appellant insisting that the verdict is contradictory, inconsistent, and does not afford a basis for any judgment at all. The latter finding is upon an immaterial issue. The cost of repairing the machine is not the measure of appellee's damages. P. & N. T. Ry. Co. v. McMeans, 188 S. W. 692, and authorities cited. The court therefore did not err in ignoring the finding of the jury in reply to the tenth issue.

We find no reversible error, and the judgment is affirmed.